**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

PIERRE FORBES,

              Petitioner,

              v.

MICHELLE RICCI, et al.,

              Respondents.

_____

Civil Action No. 09-1886 (SDW)

**O P I N I O N**

**WIGENTON**, District Judge

      Petitioner Pierre Forbes ("Petitioner") filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254(a) challenging a judgment of conviction in the Superior Court of New Jersey. The Court provided Petitioner with Mason notice and directed Respondents to file their answer to the Petition. Respondents duly complied. Petitioner elected not to traverse. For the reasons expressed below, the Court will dismiss the Petition and will decline to issue a certificate of appealability. See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I.  BACKGROUND

      The underlying events of Petitioner's conviction were defined by the Appellate Division as follows:

> Following a joint trial by jury, defendants John Martinez and [Petitioner] were convicted of aggravated manslaughter, a lesser-included offense of murder with which they were charged; and conspiracy to commit aggravated assault. For sentencing purposes, the latter conviction was merged into the former. Martinez was sentenced to a twenty-five year term with an 85% parole disqualifier pursuant to the No Early Release Act (NERA). [Petitioner] was sentenced to a thirty- year term with an 85% parole disqualifier pursuant to NERA. . . .

The criminal charges arose from the death of forty-six year old Salvatore Salierno on October 25, 1998.  At 7:30 p.m. that evening, he was found, unconscious and bleeding, lying face down next to his car in a parking lot adjacent to the apartment building in Parsippany where he lived.  He was taken to the hospital and pronounced dead.  The autopsy revealed that Salierno had sustained a two-inch laceration in the back of the head, abrasions and bruising to the right side of the neck, internal bleeding in the lumbar area, and a broken nose.  The cause of death was bleeding as a result of blunt trauma to the head, administered by an elongated object.  According to the State's proofs, Salierno had lived in the same apartment building as Ivétte and . . . Martinez who had a troubled marriage.  In October 1997, Ivette met Salierno, who was handicapped and walked with a cane, and in March 1998, the two became friends.  Martinez became jealous of that relationship.  In May 1998, he told his wife that Salierno was interfering in their marriage and that he should stay out of their business.  Later that summer, a neighbor heard Martinez yelling at Salierno at close range to "stay the 'F' away from my wife," and on another occasion that he had "friends" who could "take care" of [Salierno].  On August 22, 1998, Martinez accused Ivette of having sex with Salierno after he saw her wearing Salierno's shirt.  That same day, Ivette moved out of their apartment, and in September moved in with Salierno.  The tension between Martinez and Salierno eventually came to the attention of local police.  On August 22, 1998, the same day Ivette moved out of her apartment, Parsippany police responded to a diner, where Officer Joseph Chmura found Salierno outside complaining that Martinez, who was inside the diner with his daughter, had been making harassing calls to his residence.  Martinez denied this and told Officer Chmura that his wife was having an affair with Salierno and that he had an active restraining order against Ivette.  On the next day, August 23, 1998, Martinez gave a written statement to Parsippany police that "Sal Salierno has, for the past three months that I know about, has been having an affair with my wife in the presence of my daughter."  Apparently, Salierno and Martinez filed complaints against each other in Parsippany Municipal Court.  The situation did not abate.  Between September 18 and 20, 1998, eleven phone calls were made from Martinez's home to Salierno's.  On October 6, 1998, Martinez called Salierno's apartment several times complaining that Ivette and Salierno had taken a jeep automobile that contained equipment he needed for work and that had been awarded to him under a restraining order.  And on October 21, 1998, Martinez filed a complaint with the Parsippany Police Department accusing Salierno of taking "aggressive action" when Martinez came to pick up the jeep.  Earlier, in late August 1998, Martinez had enlisted the aid of Richard Forbes -- a long-time acquaintance who had served six years in federal prison and was living in Queens, New York -- to persuade Salierno to stay away from Ivette.  Richard obliged and, before eventually speaking to him, left messages on Salierno's answering machine, to the effect: "You leave my fuckin [sic] people alone or I'm comin [sic] on you.  You know who the fuck I'm talkin [sic] about.  You got one more time to

fuck with em and I'm gonna kill ya."  Apparently convinced this approach was not
having the desired effect, at the end of August Martinez asked Richard to recruit
some people to beat up Salierno.  In return, Richard was promised a computer that
he could use in a counterfeiting scheme he was concocting with Martinez.  Three
weeks later, Martinez gave Richard a Polaroid camera and a map with Salierno's
address on it, and told him that he wanted Salierno beaten up and his legs broken.
Richard in turn recruited his brother, [who was the Petitioner in this action], and
an acquaintance, Jeremiah Farmer, who both agreed to do it.  Farmer had been
living in the basement of the Forbes' home from where he and Richard were
selling drugs.  Richard explained to both [Petitioner] and Farmer that Martinez's
wife had been having an affair and Martinez would pay them to beat up her
boyfriend, although a specific sum was never discussed.  Richard gave them $50
bus fare to Parsippany and a camera, and made them redraw the map, retaining the
original himself.  Richard described the target Salierno as an Italian man named
"Sal," in his mid-forties who walked with a cane, lived on Baldwin Road in
Parsippany, and drove a Cadillac.  Farmers' and [Petitioner's] first two attempts
proved unsuccessful, although on the second occasion, they saw Salierno before
he got into his car and drove off.  When Farmer and [Petitioner] reported back that
the attack had not yet taken place, Richard insisted that it be done before October
27, the scheduled date for a municipal court hearing on the cross complaints of
Martinez and Salierno.  Consequently, on October 25, 1998, [Petitioner] asked
Gerald Gloster, a friend of the Forbes' family, for a ride to Parsippany to "catch
up with a person" and "take care of business."  Gloster agreed.  During the ride,
[Petitioner] and Farmer mentioned "kicking somebody's ass."  After they arrived
at the destination, the two sat in the parking lot for about twenty to thirty minutes
until a Cadillac pulled up and Farmer said "that's him."  [Petitioner] and Farmer
exited the van.  [Petitioner] approached Salierno, requesting the time and a
cigarette.  [Petitioner] then began repeatedly beating Salierno with both a metal
pipe and his hands.  Although Gloster, who remained in the van, did not see the
weapon, Farmer described it as an eight-to-ten pound pipe.  Once Salierno had
fallen to the ground, unconscious and "in a deep snore," Farmer kicked him and
took his wallet, both to prove the assault had occurred and to make it look like a
robbery.  Farmer asked [Petitioner] why he had killed him, to which [Petitioner]
replied, "that's what I wanted to do."  When the pair arrived back in Queens, they
reported to Richard that [Petitioner] had beaten Salierno with a pipe and after
Salierno was "snoring," Farmer joined in and "stomped" him.  They gave Richard
the wallet and a disposable camera and showed him the metal pipe used to beat
Salierno.  Richard at first put the camera and wallet in his dresser drawer, but
when he later learned that Salierno had been killed, he burned the camera, the
wallet and its contents.  According to Farmer, Richard telephoned Martinez in
front of him, and then asked Farmer to step out of the room.  After the phone
conversation, Richard said he told Martinez that the mission was completed and
asked about payment to which Martinez replied "be patient."  Meanwhile, police

arrived on the crime scene at 7:53 p.m. There was blood on the ground and on the Honda that was parked next to Salierno's Cadillac. Ed Williams, a detective in the forensic crime scene unit of the Sheriff's Department, and an expert in blood spatter analysis, determined that the blood spatters found on the lower rocker panel of the Honda were medium velocity spatters, which was consistent with blunt force trauma. In his opinion, the cast-off patterns on the rocker panel were caused by an instrument with blood on it, as it was being whipped up and down. A jacket taken from the victim also had medium velocity spatters on the shoulder and neck area. Because of the prior relationship between the two, Martinez became an immediate suspect, and within hours of Salierno's death, police officers were dispatched to his apartment where they conducted a search and found a journal belonging to Martinez, detailing his feelings about the relationship between Salierno and his wife. Two passages in particular read: "I still have a lot of hate for Ivette and Sal," and "God will not let him/her get away with it." The last passage in the journal is dated October 19, 1998, six days before Salierno's death. The investigation also revealed that there was a lot of telephone activity and contact between Martinez and Richard immediately before and after Salierno's homicide. A total of twenty-seven phone calls were made from Martinez's work cellular phone to [Richard and Petitioner's] residence between August 24, 1998 and October 21, 1998. Numerous calls were made from Martinez's extension and another nearby extension at his place of employment -- Manhattan Off-Track Betting on Broadway in New York City -- to [Richard and Petitioner's] residence between October 1998 and February 1999. There were also calls made to [Richard and Petitioner's] residence from Martinez's residential phone on October 12, 13, 19 and 31, 1998. Another three calls were made to [Richard and Petitioner's] residence from Martinez's new cell phone, one on November 12, and two on November 15, 1998. Richard also visited Martinez at his Manhattan office on at least three occasions -- November 6, 1998, January 14, 1999, and February 12, 1999 -- using different aliases each time. In fact, on October 26, 1998, the day after Salierno's homicide, Richard called Martinez seeking payment. The two later met at Martinez's office where Martinez told Richard that he would pay him $500 every other week. However, over the next several months, Martinez only paid him $2,000, which Richard apparently never shared with either [Petitioner] or Farmer. On one occasion, Martinez's co-worker, at Martinez's behest, delivered an envelope to an individual who matched Richard's description. Richard received his last payment of $500 in January 1999, when he also secretly recorded a conversation with Martinez. Eventually, Richard grew angry and upset over Martinez's failure to make good on his promises to give Richard a new computer, place him in a job, and start-up their counterfeiting scheme. As a result, he blackmailed Martinez for an additional $10,000, threatening to give law enforcement authorities the tape recording he made in January implicating Martinez in the crime. Fearful somehow that Martinez might confess and believing it more advantageous for him to cooperate,

Richard placed an anonymous call to the Parsippany police on January 19, 1999, saying he had evidence concerning the "Sal" murder and wanted to speak with Detective Donna D'Aguino.  He placed a second anonymous call on February 3, 1999, telling Officer Russell Arienta that he had a confession to the Salierno homicide on tape, and asked about a reward.  On February 24, 1999, once again Richard called anonymously reporting that he had a hand-drawn map given to him by Martinez and that Martinez had asked him to beat up Salierno; that he had Martinez on tape and he himself had nothing to do with the homicide.  Richard agreed to meet with Officer Arienta the next day in front of the Off-Track Betting office.  The calls were traced to Richard's home in Queens, and Richard admitted to making the calls.  On February 25, 1999, the day Richard was supposed to meet Parsippany police at Off-Track Betting, the police instead intercepted him coming out of his home.  Richard was not arrested, and gave a statement implicating Martinez and Farmer, but not [Petitioner, who was Richard's] brother, and minimizing his own role.  He also agreed to wear a wire to record Martinez.  He wore the wire on March 2, 1999, and went to see Martinez at his Off-Track Betting office.  During the conversation, the two discussed the map that Martinez supposedly drew of the route to Salierno's home in Parsippany. [Richard] said Farmer had the map and wanted to be paid, to which Martinez replied that he would help Richard as his friend with his lawyer's fees.  Martinez was arrested the next day, March 3, 1999.  Farmer was arrested in North Carolina, after he turned himself in upon hearing that he was being sought.  He had gone there in January 1999 with Richard, who had paid for his bus ticket, and who had let him listen to the tape he made of his conversation with Martinez.  Farmer gave a statement implicating himself, Gloster and [Petitioner] and said that Richard was responsible for organizing the attack on Salierno.  This was the first time the police learned of [Petitioner's] involvement in the crime.  [Petitioner] was arrested on March 9, 1999.  Farmer pleaded guilty to reckless manslaughter, conspiracy to commit robbery and conspiracy to commit aggravated assault.  He cooperated with police and testified at the trial of [Martinez and Petitioner] with the expectation that the prosecutor would recommend a more lenient sentence for him.  Gloster was also charged with murder, but pled guilty to manslaughter and conspiracy to commit aggravated assault.  He also cooperated in the investigation and testified against [Petitioner and Martinez].  As a result of [Richard's] cooperation, Richard was never charged with any offenses arising from this incident. [In fact, Richard had] a history of cooperating with law enforcement authorities in exchange for lenity in sentencing for his criminal activity.  When he was arrested on federal drug and weapons charges in the early 1990's, he became a cooperating witness. . . . [B]ased on his cooperation in that case, Richard's sentence was reduced from 380 months to 84 months, and North Carolina state charges were also dismissed as part of the deal.  On his release in October 1997, he was subject to five years probation.  Richard was also arrested in New York in January 1999 and charged with armed robbery and sale of a controlled dangerous

substance.  Based on his cooperation in an ongoing investigation, he was
permitted to plead guilty to coercion and sale of a criminal substance.  He was
facing fifty years in prison, but believed he would be sentenced to concurrent
sentences of four-and-one-half to nine years.  In fact, Richard was incarcerated at
Riker's Island and had pending New York charges against him for yet another
crime at the time he testified in [Martinez and Petitioner's] matter.
[Petitioner's] defense theory was that Richard and his associates, in exchange for
significant reductions in sentences and in Richard's case, no charges at all, were
framing Richard's brother [that is, Petitioner] for their own wrongdoing.  To this
end, the defense presented Vanyce Forbes [seemingly, Richard and Petitioner's
sister], who testified that she had a bad relationship with her . . . Richard, that she
had found a map in Richard's room labeled "Parsippany" with instructions for
public transportation, but it had disappeared; and that [Petitioner], who Farmer
said struck Salierno with a metal pipe in his right hand, [was] left-handed.
Evidently crediting the State's proofs, the jury convicted both [Petitioner and]
Martinez . . . of the lesser-included offense of aggravated manslaughter and
conspiracy to commit aggravated assault.

State v. Martinez and Forbes, docketed in this matter as Docket Entry No. 6-3, at 30-40 (N.J.

Super. Ct. App. Div. May 27, 2003).

## II. PETITIONER'S CHALLENGES

Petitioner's five challenges at bar read as follows:

(1)     Ground One: the trial court denied petitioner of his Constitutional right to a fair
        trial under the Due Process clause of the Fourteenth Amendment of the United
        States Constitution when it granted the State's motion to consolidate the trial of
        [Petitioner] with . . . Martinez . . . .

Docket Entry No. 1-1, at 3.

In support of that assertion, Petitioner contends that the bulk of evidentiary matter

presented during the trial related to Martinez, and that the sheer volume of such evidence was

such that the jurors failed to grasp what Petitioner qualifies as "lack of evidence" against him.

See id. at 3-4.

(2)     Ground Two: the trial court's limitation of the testimony of Vanyce Forbes and
        cross-examination of Richard . . . denied [Petitioner] of his Sixth Amendment

6

constitutional right to offer any evidence that tended to refute his guilt or bolster his claim of innocence . . . .

Id. at 4.

In support of that claim, Petitioner asserts that he was unable to convey to the jurors Petitioner's position that his brother Richard: (a) was a career criminal who habitually cooperated with law enforcement authorities in order to obtain lenient treatment; (b) was seeking to "frame" Petitioner in exchange for not being charged with a crime; and (c) had a motif to kill Salierno because Richard, Petitioner guesses, must have been upset with the emotions that Salierno and Ivette's affair was causing Martinez, because – Petitioner guesses – Richard must have seen this emotions as a destruction to Richard's hopes to have a "counterfeiting" business with Martinez. See id. at 4-6.

(3)    Ground Three: the trial court denied [Petitioner] his constitutional right to a fair trial in permitting unnecessary medical testimony by the medical examiner regarding the severity of the undisputed injuries suffered by [Salierno] . . . .

Id. at 6.

In support of that statement, Petitioner maintains that the State presented more evidence that, in Petitioner's opinion, would be necessary to meet the charges against Petitioner, and that excessive evidence (excessive either in volume or in detail, or in both respects) resulted in undue prejudice against Petitioner.  See id. at 6-9.

(4)    Ground Four: the prosecutor's comments during closing arguments and it's use of Richard . . . as it's primary witness denied Petitioner of his constitutional right to due process and a fair trial . . . .

In support of this claim, Petitioner asserts that the prosecutor committed a reversable error during summation when the prosecutor:  (1) compared Petitioner's attack on Salierno to the

attack on Pearl Harbor; (2) referred to Petitioner's defense theory by utilizing the phrase "sloppy thinking"; and (3) stressed to the jurors that Petitioner's name was disclosed, during the investigation of Salierno's murder, only when Farmer talked to Sergeant Denamen (rather than as a result of Richard's attempt to frame Petitioner, i.e., his brother; and reflected on the Sergeant's testimony). Id. at 8-10. Petitioner also asserts that the prosecutors committed a prosecutorial misconduct by electing to use Richard as the State's primary witness. See id. at 11-12.

(5)     Ground Five: trial counsel's failure to investigate and pursue and alibi defense
          denied Petitioner of his constitutional right to effective assistance of counsel . . . .

Id. at 13.

        In support of this final contention, Petitioner asserts that his counsel was ineffective by failing to call a certain "'Bobby' Khan" as Petitioner's alibi witness. Petitioner does not clarify what this Bobby Khan would testify to; he merely alleges that: (a) Khan was the owner of a car lot where Petitioner worked as a night guard; and (b) the car lot was fenced, with the night guard typically being locked inside this fenced area. See id.

## III.  STANDARD OF REVIEW

        Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to entertain a habeas petition challenging a state conviction or sentence only where the inmate's custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in
> behalf of a person in custody pursuant to the judgment of a State court only on the
> ground that he is in custody in violation of the Constitution or laws or treaties of
> the United States.

28 U.S.C. § 2254(a).

8

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d 152, 159 (3d Cir. 1997). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Phillips, 455 U.S. 209, 221 (1982). "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable. It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts." Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982). "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause." Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997). Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts. Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996). Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary." Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002). Where a federal claim was "adjudicated on the merits" in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim:

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).   "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)), rev'd on other grounds by Rompilla v. Beard, 545 U.S. 374 (2005).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever.  Rompilla, 355 F.3d at 247.

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable.  Id. at 409-10.

A court begins the analysis by determining the relevant clearly established law.  See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004).  Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.   A court must look for "the governing

10

legal principle or principles set forth by the Supreme Court at the time the state court renders its decision."  Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

## IV.  DISCUSSION

### A.    Consolidation of Trials

Petitioner's Ground One (asserting that it was improper for the state court to consolidate his trial with Martinez's because, in Petitioner's opinion, the magnitude of evidence against Martinez prevented the jurors from observing "lack" of evidence against Petitioner) warrants no habeas relief.

This Ground One, in its statement of supporting facts and its statement of claim, repeats, verbatim, Petitioner's challenges raised in connection with Petitioner's application for certification by the Supreme Court of New Jersey, that is, short of the fact that Petitioner appended a pre-fix and a suffix to the language of the claim to package it in terms of federal law. Compare Petitioner's direct appeal, Docket Entry No. 7-6, at 17 (reading, "the trial court erred in granting the State's motion to consolidate the trial of defendant with co-defendant John Martinez") to Petition, Docket Entry No. 1-1, at 3 (reading, "the trial court denied Petitioner of his constitutional right to a fair trial under the Due Process clause of the Fourteenth Amendment of the United States Constitution when it granted the State's motion to consolidate the trial of defendant with co-defendant John Martinez and to the extent that the State court's decision is contrary to and/or an unreasonable application of clearly established federal law").  Same as in Petitioner's application for certification, Petitioner's argument before this court makes no reference to any law, be it state or federal – that is, short of the "packaging" reference to federal due process and the repeat of the standard of review applicable to habeas petitions.

11

Moreover, Petitioner's challenges presented to the Appellate Division were based, entirely and wholesale, on state law. See Docket Entry No. 7-4, at 44-46 (relying exclusively state procedural rules and state case law). Furthermore, the Appellate Division affirmed Petitioner's conviction without addressing the consolidation issue, see id. at 57, hence affirming – with regard to the consolidation issue – on the very same state-law grounds that were raised by Petitioner.

Now, Petitioner "repackaged" his purely-state-law-based challenges by merely adding a federal label and a standard of review applicable to federal habeas, but such "repackaging" cannot change the fact that Petitioner's state-law challenges fall outside the scope of federal habeas review. See Johnson, 117 F.3d at 110 ("[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause"). Indeed, it has been long established that matters of state procedural law are not reviewable in a federal habeas petition; to that effect, the Supreme Court expressly guided that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). This is generally true even where the state court incorrectly applied state law. See id. at 71. Rather, a federal habeas claim will lie only where a state court determination violated some federally protected right. See id. at 68. The Third Circuit likewise stated:

> Our review of a federal habeas corpus petition is limited to remedying deprivations of a petitioner's federal constitutional rights. We can take no cognizance of non-constitutional harm to the defendant flowing from a state's violation of its own procedural rule, even if that rule is intended as a guide to implement a federal constitutional guarantee.

Wells v. Petsock, 941 F.2d 253, 256 (3d Cir. 1991), cert. denied, 505 U.S. 1223 (1992); see also Smith v. Zimmerman, 768 F.2d 69, 73 (3d Cir. 1985) ("a 'mere error of state law' is not a denial

of due process").  Hence, Petitioner's Ground One shall be dismissed for failure to assert a

violation of his federal rights.  See Toussaint v. Klem, 2004 U.S. Dist. LEXIS 5403 (E.D. Pa.

Mar. 31, 2004) (state-law-based affirmance of consolidation of two rape cases was not subject to

federal habeas review); see also Connelly v. Beard, 2010 U.S. Dist. LEXIS 93923 (E.D. Pa. Aug.

9, 2010) (same, with regard to consolidation of four cases against the defendant).

     Alternatively, if this Court were to accept, at face value, Petitioner's suffix and pre-fix

repackaging Petitioner's claims in terms of federal due process, Petitioner's claims are subject to

dismissal: (a) as unexhausted, since no federal challenges were presented to the state courts; and,

in addition, (b) on merits, as unexhausted by facially meritless challenges.   See 28 U.S.C. §

2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits,

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State"); Lambert, 134 F.3d at 515 (district court may deny an unexhausted petition on the merits

under § 2254(b)(2) "if it is perfectly clear that the applicant does not raise even a colorable

federal claim").

     To the extent that Ground One might be read as raising a federal due process claim,

habeas relief is not warranted because, as Respondents duly noticed, "[i]mproper joinder does

not, in itself, violate the Constitution.  Rather, misjoinder would rise to the level of a

constitutional violation only if it results in prejudice so great as to deny a defendant his [due

process] right to a fair trial."  United States v. Lane, 474 U.S. 438, 446 n.8 (1986).  Petitioner

asserts that the volume of evidence against Martinez so distracted the jurors that they ignored

"lack" of evidence against Petitioner: effectively, Petitioner asserts nothing but self-serving

conjecture as the record is replete with abundance – rather than lack – of evidence against

Petitioner, i.e., with testimonies of Farmer, Gloster, Richard, law enforcement officials, etc.

Such abundance of evidence (especially if read in conjunction with legitimate state court's

interest in resolving the heavily-contested credibility issues consistently with regard to the

witnesses testifying against both Martinez and Petitioner), renders the state-court decision to

consolidate Petitioner and Martinez' trials not contrary to – or not an unreasonable application of

– Supreme Court precedent.  See Herring v. Meachum, 11 F.3d 374, 377-78 (2nd Cir. 1993)

("where a defendant is claiming a due process violation based upon joinder of offenses, he must,

to succeed, go beyond the potential for prejudice and prove that actual prejudice resulted from

the events as they unfolded during the joint trial"); see also Laws v. Yeager, 448 F.2d 74, 82 (3d

Cir. 1971); Evans v. Follette, 364 F.2d 305 (2d Cir. 1966).

Therefore, Petitioner's Ground One is subject to dismissal as facially meritless and,

hence, subject to sua sponte dismissal or, in alternative, on the grounds that the state court's

dismissal of this line of Petitioner's claims was not an unreasonable application of the relevant

Supreme Court precedent.

**B.  Limitation of Testimony and Cross-Examination**

In his Ground Two, Petitioner lumps together, under the heading of the Sixth

Amendment, his assertions that his trial judge: (a) unduly limited testimony of Petitioner and

Richard's sister, Vanyce, by excluding just one aspect, i.e., Vanyce's hearsay about a statement

that Richard allegedly made to Vanyce once upon a time; and (b) unduly limited Petitioner's

cross-examination of Richard by excluding two narrowly-tailored details of Richard's criminal

past.  See Docket Entry No. 1, at 4-6.

14

Peculiarly enough, the Petition is entirely silent – that is, short of twice mentioning Vanyce's name (once in the heading of Petitioner's Grown Two, and once in that part of his "factual support" statement which presents a mere recital of the habeas standard of review, stripped of any factual allegations) – as to how Petitioner was prejudiced by Vanyce's not testifying "more."[1] See id. at 4 and 6.

With regard to Richard's cross-examination, Petitioner asserts that the jurors were prevented from being notified about: (a) Richard's being a career criminal habitually escaping severe punishments by cooperating with law enforcement officials; and (b) Richard's animosity toward Petitioner (which, Petitioner guesses, Richard might have been feeling in response to Petitioner's alleged once-upon-a-time statements of displeasure about Richard and Farmer's drug-selling operation from the house where Petitioner and the rest of Petitioner's family – seemingly including, inter alia, Richard himself – lived); and, hence, (c) Petitioner's position that

---

[1] Having no Petitioner's factual argument raised here, with regard to his habeas challenges related to Vanyce's testimony, the Court turns to Petitioner's arguments presented for state court's review. The transcript reveals that Vanyce did, indeed, testify extensively as to her bad relationship with Richard Forbes, as well as to her finding of a map in Richard's room (and as to the content of that map, i.e., its heading "Parsippany" and instructions for public transportation access to that locale), and she even testified by providing Petitioner with a favorable-to-Petitioner statement that he was left-handed (to contrast the fact that Salierno was killed as a result of injuries suggesting that the attacker used his right hand during the assaults). The only limitation imposed by Petitioner's trial court was, seemingly, the court's finding that Petitioner's attempt to question Vanyce about an alleged death threat, uttered to her by Richard – once upon a time  – with regard to Vanyce's husband, was too removed from the issued raised by Martinez/Petitioner's trial to be relevant, plus presented impermissible-under-state-law-of-evidence character evidence as to a prior bad act of Richard, the State's witness. During Petitioner's state proceedings, Petitioner asserted that such limitation was an error because Richard's alleged death threat uttered by Richard to Vanyce with regard to Vanyce's husband might have indicated to the jurors that Richard had his own motifs to kill Salierno and/or to frame Petitioner. This Court, therefore, reads the same factual background and legal contention into the Petition filed in this matter: simply because the Petition is wholly silent in that respect.

Richard wished to "frame" Petitioner on the basis of Richard's "modus operandi" described in "(a)" and/or the animosity speculated by Petitioner in "(b)."  See id. at 4-6.

During his state appellate proceedings, Petitioner's challenges as to the aforesaid limitations on testimony were based, wholly and exclusively, on state precedent.  See Docket Entry No. 7-4, at 46-51 (citing only decisions of the New Jersey Supreme Court).[2]  The Appellate Division: (a) affirmed Petitioner's conviction without expressly addressing Petitioner's challenges based on the limitation as to Vanyce's testimony; and (b) dismissed Petitioner's challenges as to the limitation on cross-examination of Richard (such dismissal was made, too, on the basis of relevant state law, but with a single mentioning of a federal precedent, i.e., Pointer v. Texas, 380 U.S. 400 (1965)).  This Court, therefore, presumes that the Supreme Court precedent in Pointer was among the guiding posts in the state court's analysis and, hence, reviews the state court's decision accordingly.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. Const. amend. VI.  The right is secured for defendants in state as well as federal criminal proceedings by the Fourteenth Amendment.  See Pointer v. Texas, 380 U.S. at 403.  The protections of the Confrontation Clause necessarily include the right to cross-examination a witness.  See Smith v. Illinois, 390 U.S. 129, 131 (1968).  The scope of such cross-examination is, generally, broad and basic information cannot be excluded; for instance, where credibility is at issue, the trial court cannot ordinarily prohibit the defense from

---

[2]  In fact, Petitioner's challenges raised to the Appellate Division were based on state law. Petitioner's application for certification with the Supreme Court of New Jersey relied on no legal provision or precedent, it merely recited Plaintiff's conjecture as to Richard's emotions and disappointment with the Appellate Division's affirmance of Petitioner's conviction.

16

inquiring into a witness's identity and residence.  See id. at 131.  Such questions are "not only an appropriate preliminary to the cross-examination of the witness, but . . . [are] an essential step in identifying the witness with his environment, to which cross-examination may always be directed."  Id. at 132 (quoting Alford v. United States, 282 U.S. 687, 693 (1931)).  In other words, defense must be able "to make a record from which to argue [that the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."  Id.

However, the right to cross-examination is not without limits, as "the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  Delaware v. Fensterer, 474 U.S. 15, 20 (1985).  Thus, the scope of cross-examination regarding a particular line of inquiry falls necessarily "within the sound discretion of the trial court," and "it may exercise a reasonable judgment in determining when [a] subject is [inappropriate]."  Alford, 282 U.S. at 694.  "[T]rial judges retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness'[s] safety, or interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).

Here, the Appellate Division detailed the relevant trial events and ruled as follows:

We first address [the] issue [of] whether the trial judge improperly limited cross-examination into the details of Richard['s] . . . cooperation in past and pending investigations involving other crimes in other jurisdictions.  Although the [trial] court allowed extensive questioning not only about Richard's cooperation with authorities on the investigation related to this case, but as to his cooperation with federal authorities in the early 1990's and with New York state authorities on a pending investigation, it declined to permit inquiry as to the specific nature of the North Carolina state charges (solicitation of murder) involved in the former, or the specific details of the pending investigation (homicide) involved in the latter.

The court reasoned that such testimony was irrelevant to the issues at hand and potentially prejudicial to [Martinez and Petitioner] themselves since the implication might be that if Richard had solicited a murder in the past, he might be more likely to have solicited this murder [which, in turn, would suggest that Martinez and Petitioner entered into a premeditated conspiracy to murder Salierno.  Martinez and Petitioner now] contend that such a limitation effectively deprived them of their right to confront witnesses and to a fair trial.  We disagree.  The right to confront and cross-examine witnesses is constitutionally guaranteed.  [See] Pointer v. Texas, 380 U.S. 400 . . . .   By the same token, trial judges are afforded broad discretion in setting the appropriate limits of cross-examination. . . .  Here, defense counsel were afforded broad latitude in exploring all appropriate avenues in uncovering witness bias.  They were allowed to elicit the full extent of Richard's cooperation and resultant benefits not only in this matter, but also in unrelated past and pending investigations in other jurisdictions, including the fact that he continues to cooperate with, and be under the supervision of, law enforcement authorities.  The jury was made aware of any incentives Richard may have had to fabricate his testimony on behalf of the State and for his own benefit, such as leniency in this and other matters, and defense counsel were therefore free to argue that the witness was incapable of telling the truth if it meant he might go to prison.  Indeed, after extensive cross-examination into every aspect of his other agreements with law enforcement authorities save for the specific charges, the jury was left with the clear impression that Richard was a career criminal who knew how to finagle authorities in exchange for leniency, having done it three times, including presently, and having obtained good deals each time.  In explaining his ruling [as to the modest limitation on Richard's testimony], the trial judge said: "Everything about [Richard's potential bias] is being brought out, the length – the benefit he received, the length of sentence he received, the fact that he's on supervision, the fact that he was incarcerated, the fact he cooperated with this agent, that he continues to cooperate with the agent."  There is little, if anything, that further testimony about the specific North Carolina state charges in the early 1990's, or the specific nature of the pending New York investigation, would have added to the bias inquiry.  These other two investigations had absolutely no factual relevance to the case at hand, and the fact that they involved murder would not, in our view, have detracted any more from [Richard's] credibility or shown any more bias on his part.  We, therefore, conclude that the exclusion of this detail did not lead the jury to a "result it otherwise would not have reached." . . . Here, . . . Richard's entire involvement in the Salierno homicide was disclosed and defendants were not barred from asking any questions relative to the crime at hand. . . . [T]he jury in the case was made aware of the full extent of Richard's illegal activities for which he was receiving immunity in this instance.  The only curtailment on cross- examination was a very limited preclusion on inquiry into the specific charges in a prior prosecution and a pending investigation – both out-of-state that had no factual relevance to the

matter at hand.  Having no real relevance to the issue of bias, we are at a loss to explain the significance of the excluded details other than perhaps to suggest [Richard's] bad character and bad reputation.  Not only would the admission of such evidence be . . . impermissible [under the State rules of evidence,] it might have also worked to the undue prejudice of [Martinez and Petitioner] who were making the proffer in the first instance.  Had the jury heard that Richard was involved in other homicides, including the solicitation of murder in North Carolina and another currently under investigation in New York, it may well have drawn the impermissible inference that it was more likely that he solicited this murder, and that . . . Martinez hired him for this very purpose, due to his past experience with homicides, and not simply to beat up Salierno [and so Petitioner was drafted by Richard accordingly].

Docket Entry No. 6-3, at 42-47 (citations to state law omitted, footnote 1 incorporated into the main text, original brackets removed).

This Court agrees with the gist of the state court's determination.  The trial judge's decision to exclude the threatening utterance made, allegedly, by Richard to Vanyce as to Vanyce's husband, or to exclude the specifics of Richard's North Carolina or New York charges was not an unreasonable application of the Supreme Court precedent.  The testimonies actually provided by Vanyce and Richard painted a full picture of Richard's potential bias, of his being a career criminal, and of his mode of escaping severe punishment by cooperating with law-enforcement officials post-offence.  The fact that Petitioner preferred to hammer Richard's character flaws further is of no import, since the jurors were provided with more than ample basis for questioning the credibility of Richard's testimony.  See Fensterer, 474 U.S. at 20 (the scope of a cross-examination does not automatically run afoul of the Constitution if it "is not to whatever extent the defense might wish").   Consequently, Petitioner's trial judge's exercise of discretion was well-grounded and carefully-tailored: the limitation on examinations were reasonably made in order to preserve the gist of Petitioner's defense theory based on Richard's

19

bias while excluding the subject clearly inappropriate under the state law, which this court, sitting in habeas review, is not in position to second-guess.[3]  See Alford, 282 U.S. at 694; Van Arsdall, 475 U.S. at 679.

Therefore, Petitioner's Ground Two will also be dismissed, since the state court's application of the relevant Supreme Court precedent was not unreasonable.

### C.  Admission of "Too Much" of Similar Evidence

Petitioner's Ground Three asserts that Petitioner's trial court erred by allowing a "too extensive" testimony of the State's expert witness with regard to the severity of Salierno's injuries.  Stripped of all niceties, Petitioner's Ground Three can be reduced to a statement that, since there was no dispute that Salierno's injuries were such that they led to his death, there was no need for the State to detail the exact list of these injuries and/or the nature of each injury.

As detailed below, Petitioner's allegations are without merit.[4]

_____

[3]  This Court is at loss striving to detect a logical rationale as to Petitioner's claim that Richard's alleged utterances to Vanyce or the details of Richard's criminal history might have aided Petitioner in his claim that Richard was trying to "frame" Petitioner for Salierno murder, since there is not a shred of evidence in the record suggesting that Richard tried to frame Petitioner for the offences in North Carolina or in New York, or for the allegedly fancies murder of Vanyce's husband (who was not harmed at all) and, hence, no argument could be extracted from these details to aid Petitioner's "framing" claim.  Moreover, the extensively-testified-to fact of Richard's concealment of Petitioner's involvement in Salierno's murder for as long as Richard could (i.e., until Petitioner's involvement was disclosed through statements made by Farmer and Gloster) renders Petitioner's "framing" theory puzzling at best.

[4]The essence of Respondents' defense could be reduced to three statements: (a) Petitioner's Ground Three should be deemed unexhausted (because, with regard to this Ground Three, Petitioner raised only state-law-based challenges during all his proceedings before the state courts); (b) this Court's grant of stay-and-abeyance remedy would be an abuse of discretion because Petitioner's Ground Three is facially meritless; and (c) the entire Petition should be dismissed as "mixed petition."  See Docket Entry No. 7, at 25-29.  The rationale of Respondents' position escapes this Court.  First, it is worth noting that a "mixed petition" cannot be dismissed

(continued...)

20

"[F]ederal habeas corpus relief does not lie for errors of state law," Estelle v. McGuire, 502 U.S. 62, 67 (1991), such as evidentiary rulings, unless the rulings rendered the trial so fundamentally unfair that a denial of constitutional rights results.  The admission of evidence violates due process only if an evidentiary ruling is so egregious that it results in a denial of fundamental fairness: then it may violate due process, and thus warrant habeas relief.  However, courts "have defined the category of infractions that violate 'fundamental fairness' very narrowly."  Dowling v. United States, 493 U.S. 342, 352 (1990).  Generally, state-court evidentiary rulings cannot rise to the level of due process violations unless they "offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental."  Montana v. Egelhoff, 518 U.S. 37, 43 (1996).  Thus, unless Petitioner can demonstrate that the introduction of this evidence denied him his right to a fair trial or due process, habeas relief is not warranted.

---

[4](...continued)
without providing Petitioner with an opportunity to withdraw his unexhausted claims and proceed with the remaining exhausted challenges.  Second, Petitioner's Ground Three is no less exhausted (or no more unexhausted) than Petitioner's Ground One, where Petitioner's challenges during state proceedings were, too, based solely on state law, and – same as his Ground Three challenges – were merely "repackaged" for the purposes of this action by a mechanical addition of suffix and pre-fix language (injecting federal constitutional labels and reciting habeas review standard) to his claims which – in all other respects – were copied, verbatim, from his state applications.  Hence, this Court is not entirely clear as to how Respondents distinguished Ground One from Ground Three in connection with lack of exhaustion.  Finally, presuming that Petitioner's Ground Three is so facially meritless as to not amount to a colorable claim (and, hence, to suggest that a grant of stay and abeyance would be an abuse of this Court's discretion, as Respondents contend), then the Petition cannot be dismissed as a "mixed petition" on the basis of this Ground Three: in that event, the Petition should be dismissed for failure to assert a violation of Petitioner's federal rights, with the issue of exhaustion dispensed – with regard to the facially meritless Ground Three – under Lambert, 134 F.3d at 515, and § 2254(b)(2), same as it was done with regard to Ground One.

Here, Petitioner asserts that the prejudicial effect of detailed expert testimony as to the list/nature of wounds suffered by Salierno greatly outweighed the probative value of this evidence simply because there was, allegedly, no dispute as to the fact that Salierno injuries were such to necessarily cause his death.  Even if this Court were to adopt, hypothetically, Petitioner's position that there was no dispute to the lethality of Salierno's wounds (although the record suggests that there was merely no dispute as to the fact that Salierno died from his wounds rather than as to the lethality/non-lethality of injuries), this Court has to disagree with Petitioner's due process extrapolations.

The fact that a victim suffered an injury that would necessarily result in the victim's death does not, in and by itself, dispose of the issues associated with all inquiries related to defendant's infliction of these injuries, e.g., a patently deadly injury could be inflicted as a result of a single reckless blow (e.g., when an assailant fails to take in account the force of the assault and/or fragility of the victim) or even in a state of criminal negligence (such as accidental shooting or driving under influence of alcohol/controlled substances), without any mental state suggesting the defendant's interest in the victim's death.  Conversely, a systemic infliction of a chain of serious injuries might be indicative of the assailant's <u>mens rea</u>, which must be established for the purposes of any penal conviction (short of those based on strict liability).  Therefore, Petitioner's claim that the number of injuries suffered by Salierno (or the nature/magnitude of each such injury) had no probative value – or added a merely nominal probative value – is without merit. Moreover, the inflammatory effect of expert's testimony as to each such injury cannot be deemed increasing in direct proportion to the amount of testimony, <u>i.e.</u>, in the event the jurors were availed to statements elaborating of a number of deadly injuries suffered by Salierno, the

inflammatory effect of additional expert statements elaborating of the list and nature of other injuries was likely to be <u>de</u> <u>minimis</u>.  Since here, Petitioner concedes that a "certain" amount of expert discussion of Salierno's injuries was properly admitted, and he merely maintains that his trial court erred by admitting "too much," Petitioner's allegations do not paint a picture where the prejudicial effect could outweighed the probative value.  Petitioner's allegations do not suggest a scenario calling in question the fundamental fairness of his trial.

Therefore, Petitioner's Ground Three will be dismissed as facially meritless and subject to <u>sua</u> <u>sponte</u> dismissal or, in alternative, on the grounds that the state court's decision as to this line of challenges was not an unreasonable application of the applicable Supreme Court precedent.

### D.  <u>Prosecutorial Comments at Summation and Use of Richard as Primary Witness</u>

Petitioner's Ground Four challenges three comments made by his prosecutor during summation, <u>i.e.</u>, (a) prosecutorial comparison between attack on Salierno and the infamous Pearl Harbor attack, (b) related prosecutorial statement suggesting that the police officer who testified that the police learned of Petitioner's involvement in Salierno's murder from Farmer (rather than as a result of Richard's "framing" of Petitioner) should be assessed in light of the officer having no reason to cooperate with the State in the fashion where the officer would purge himself; and (c) prosecutorial statement that defense theory (based on Richard's "framing" of Petitioner) was a product of "sloppy thinking."   In addition, Petitioner asserts that the State violated Petitioner's rights by selecting Richard as the State's primary witness.

Addressing this line of Petitioner's challenges, the Appellate Division stated:

Prosecutors are afforded considerable leeway in closing arguments as long as their comments are reasonably related to the scope of the evidence presented. They are entitled and expected to make vigorous and forceful closing arguments. However, the primary duty of the prosecutor is not to obtain convictions, but to see that justice is done. It is as much the prosecutor's duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. Thus, prosecutorial misconduct can be a ground for reversal where the prosecutor's misconduct was so egregious that it deprived the defendant of a fair trial. In determining whether a prosecutor's misconduct was sufficiently egregious, an appellate court must take into account the tenor of the trial and the degree of responsiveness of both counsel and the court to improprieties when they occurred. [Petitioner] first complain[ed] about the prosecutor's comment at the beginning of summation seemingly comparing Martinez's culpability to that of Japanese Admiral Yamamoto for the attack on Pearl Harbor. Defendants argue such a comparison was an unfair and emotional appeal to the jury and wholly improper. Although hyperbolic and better left unsaid, we perceive no undue prejudice to [Martinez and Plaintiff]. The comment focused on the unintended consequences of a plan set in motion by one giving orders, suggesting that like Yamamoto, Martinez solicited the attack on Salierno and, even if he did not actually intend for him to be killed, he was nevertheless responsible for that unintended consequence. We discern no egregious error in this remark. Nor do we find error in the prosecutor's references to defense counsel's "sloppy thinking." While it is improper to demean the role of defense counsel or impugn his integrity without basis in fact, or cast unjustified aspersions on his motives, that was clearly not done here. Rather, the comments related solely to the evidence and the conclusions being drawn therefrom by the defense. The prosecutor was simply arguing that the defense's version of events was just not plausible. The remarks denigrated the theory being urged by defense counsel, and not defense counsel themselves. There was nothing improper about these references. . . . Lastly, defendants complain that the prosecutor's comment about Sergeant Denaman impermissibly suggested he should be believed simply because he was a police officer who took an oath to tell the truth. To be sure, such a suggestion would be improper. But that was clearly not the gist of the prosecutor's reference in this case. He was simply arguing that the witness was credible in response to the defense attack that the State would do anything in this case to secure a conviction. The prosecutor's reply was appropriate. Defendants [also] complain . . . about the State's use of Richard Forbes as its primary witness. We have reviewed these claims in light of the record and arguments of counsel and find them devoid of merit and not worthy of discussion in a written opinion.

Docket Entry No. 603, at 47-51 (citations to state law omitted, original brackets and quotation marks removed).

24

Petitioner's first assertion, i.e., that *he* was compared to Admiral Yamamoto is factually baseless: the Appellate Division correctly understood the record as indicating that the comparison was made as to Martinez, not as to Petitioner.  Indeed, Petitioner concedes that the prosecutor stated:

> Admiral Yamamoto of the Imperial Japanese navy [concocted] the plan [of] the sneak attack on Pearl Harbor.  The immediate result of that plan was the death of thousands of American servicemen and servicewomen.  The natural and probable consequences of that plan, however, was the destruction of his country, the rousing of the United States of America and ultimately the victory in the Second World War. . . . [Same as Admiral Yamamoto,] John Martinez [was] the only man who had the malice and the desire to see Salierno silenced to keep Salierno from doing what he was doing.  The problem was, although he had the malice, he didn't have the wherewithal to do it himself.  So he turned to an old friend, Richard . . . .  And in turning to that old friend, he set in motion the ultimate destruction of his unsuspecting target Salierno [analogous to destruction of thousands of unsuspecting American servicemen and servicewomen stationed at Pearl Harbor].

Docket Entry No. 7-5, at 52-53.[5]

Since the prosecutor's comment – which, the Court notes in passing survives constitutional challenge on the grounds of the due process test detailed below – was unambiguously made with regard to Martinez and not Petitioner, Petitioner's allegation based on this comment will be dismissed as factually unfounded, without a detailed discussion of the pertinent legal regime.

Petitioner's second and third allegations are equally without merit.

---

[5] Since Petitioner's challenges presented to state courts were based wholly and exclusively on state law, and the state court's decision was, too, based wholly and exclusively, on state law, these challenges cannot be deemed exhausted by Petitioner's now "repackaging" them into federal claims by merely adding suffix and pre-fix language consisting of federal law labels and recitals of habeas standard of review.  However, Petitioner's claims are subject to dismissal, as meritless, same as Petitioner's Grounds One and Three.

The record indicates that Petitioner's (and Martinez's) counsel: (a) argued that (a) there was no conspiracy to injure Salierno;[6] and (b) expressly accused the State of "willing to do anything" to obtain convictions.   In response to *those* statements, the prosecutor stated that: (a) the incongruence between the sheer volume of evidence suggesting conspiratorial conduct and defense theory to the contrary was a product of "sloppy thinking"; and (b) a juror's agreement with the defense's assertion that the State was "willing to do anything" to obtain convictions would, in turn, imply that the State could commit even such improprieties as getting the police officer (who testified about how Petitioner's identity was learned) to provide the jurors with a perjurous testimony.[7]

"[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." United States v. Young, 470 U.S. 1, 11 (1985).  The Supreme Court has explained that the proper standard of review to be applied in a federal habeas proceeding of allegedly improper prosecutorial statements during a criminal trial is "the narrow one of due process, and not the

---

[6]  In light of the evidentiary basis admitted in the record, this Court finds itself at loss at fancying the rationale of Petitioner/Martinez's position that there was no conspiracy as to Salierno's murder, since – in that case – it is entirely unclear why assailants retained Gloster's aid to drive to Parsippany and then sat and waited for Salierno, and then attacked Salierno.

[7]  Specifically, the prosecutor stated, "[the police officer's t]estimony is crystal clear that the first time [Petitioner's] name bec[ame] mentioned in [the investigation of Salierno's murder was] when . . . Farmer talk[ed] to [the police officer].  For you not to believe that you would have to find that [the police officer] was so morally bankrupt that he came [now] before you, took an oath and lied not only to assist the case against . . . Martinez but knowingly lied to help [Richard] frame an [allegedly] innocent man [i.e., Petitioner].  And to be frank, if you believe that, there nothing I can say beyond thank you for your service."  Docket Entry No. 1-1, at 10.

broad exercise of supervisory power." <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637, 642 (1974). For a federal court to grant habeas relief it "is not enough that the prosecutor's remarks were undesirable or even universally condemned," rather the appropriate question is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986) (citations and internal quotation omitted).  To demonstrate entitlement to habeas relief, the petitioner must show the prosecutor engaged in egregious misconduct, not simply that the trial court erred.  <u>See</u> <u>Smith v. Phillips</u>, 455 U.S. 209, 221 (1982).  As our Court of Appeals explained, "improper conduct is not, in itself, sufficient to constitute constitutional error, even when . . . that conduct is alleged to be both deliberate and pervasive."  <u>Marshall v. Hendricks</u>, 307 F.3d 36, 67 (3d Cir. 2002). Rather, "[i]mproper conduct only becomes constitutional error when the impact of the misconduct is to distract the trier of fact and thus raise doubts as to the fairness of the trial."  <u>Id.</u> Moreover, the concept of "fair response" allows a party to respond to statements made by opposing counsel.  <u>Cf.</u> <u>United States v. Robinson</u>, 485 U.S. 25, 32 (1988).[8]

Here, the prosecutor's comments were a responsive argument to the attack defense made on the credibility of the State's witness (and the entirety of the State's position that Petitioner and Martinez were implicated in and liable for Salierno's death).  Thus, the prosecutor's resort to poetic license – taken, seemingly, in order to highlight the incongruence between the defense's theory and evidence in the record – did not violate the norms of due process.  While perhaps the

---

[8]  In <u>Robinson</u>, the Supreme Court held that – once defense counsel had asserted in closing argument that the government did not allow the defendant to tell his side of the story – it was not a violation of the Fifth Amendment for the prosecutor to respond by telling the jury that the defendant could have testified if he so chose.  <u>See</u> <u>Robinson</u>, 485 U.S. at 26-28 & n.2.

prosecutor's comments were set in terms less-than-ideal for the purposes of a judicial

proceeding, these comments cannot be read, with any stretch of imagination, as impinging of

Petitioner's due process rights to such degree as to deprive him of a fundamentally fair trial.

   The same applies to Petitioner's displeasure with the State's strategic decision to utilize

Richard as the State's primary witness.  There is no constitutional provision this Court is aware

of that might allow this Court to find a constitutional violation in the selection of witnesses made

by the prosecution: the courts can neither second-guess attorney's strategic choices nor can they

pass judgment on the attorney's decision to put all his/her eggs in one basket or to put the

emphasis on the witness appearing most advantageous to the attorney's case under the unique

circumstances of each particular litigation.  Cf.  United States v. Gwyn, 481 F.3d 849, 851 (2007)

("strategic decisions such as whether to call a witness belong to the attorney").  Consequently,

Petitioner's Ground Four will be dismissed, since the state courts' determinations with regard to

this line of Petitioner's challenges were not an unreasonable application of the relevant Supreme

Court precedent.

   **E.  Failure to Investigate and Offer the Testimony of "Khan"**

   Finally, Petitioner's Ground Five asserts that his federal rights were violated because his

defense counsel was, allegedly, ineffective in failing to investigate Khan (and, hence, in failing to

detect if Khan could have provided Petitioner with some form of favorable testimony, and if so

would appear, in failing to offer such potentially favorable testimony to the jurors).  Simply put,

Petitioner's position could be severed into two points: (a) Petitioner's conjecture that Khan might

have been able to testify to "something favorable" to Petitioner; and (b) Petitioner's conclusion

28

that his defense counsel was ineffective by failing to chase this "something favorable" and then, if found, offer this "something favorable" at Petitioner's trial.

Seemingly recognizing that these allegations present multiple layers of conjecture, Petitioner asserts that Khan, being the owner of a car lot where Petitioner was allegedly employed as a night guard, could have testified that, typically, the night guards, were locked inside a "fenced area" that, seemingly, was either located within or embraced that car lot.

Respondents raise two lines of challenges to Petitioner's position. Specifically, responding to Petitioner's conjecture that Khan's potential testimony as to the allegedly typical locking of the night guard inside the car-lot's fenced area might have been helpful to Petitioner, Respondents state that Petitioner "conjures an image for a potential juror far less impregnable than Fort Knox." Docket Entry No. 7, at 54. However, the conjecture posed by Petitioner is *not* whether someone could break *into* the car lot but, rather, whether Petitioner could *leave* that car lot to commit his assault on Salierno (that is, if Petitioner were presumed to be expected to actually work at that car lot during the time when Salierno was killed).

In addition, Respondents contend that Petitioner's challenges (wither those raised in Petitioner's Ground Five or the entirety of the Petition) should be dismissed as "procedurally defaulted" because Petitioner presented the state courts with the same conjecture that he presents now to this Court, instead of: (a) investigating what exactly Khan's testimony could have been about; and (b) presenting Khan's affidavit to that effect to the state courts.

Respondents err in their understanding of the term "procedural default" for the purposes of habeas review.

Procedural default does not accrue in the event a litigant raises deficient challenges to state courts, e.g., by substituting factual assertions with self-serving conjecture.  A state court's dismissal of a litigant's substantively insufficient claim differs from the situation where a litigant's claims are dismissed as "procedurally defaulted."

In short, procedural default accrues if there is "an absence of available State corrective process," 28 U.S.C. § 2254(b)(1)(B)(i); see also Coleman v. Thompson, 501 U.S. 722, 730-32 & n.1 (1991); Harris v. Reed, 489 U.S. 255 (1989); Cabrera v. Barbo, 175 F.3d 307 (3d Cir. 1999); Toulson v. Beyer, 987 F.2d 984, 987-89 (3d Cir. 1993), or where "circumstances exist that render [State corrective] process ineffective to protect the rights of the applicant."  28 U.S.C. § 2254(b)(1)(B)(ii);  Christy v. Horn, 115 F.3d 201, 207 (3d Cir. 1997) (state corrective process is ineffective where  "state remedies are inadequate or fail to afford a full and fair adjudication of the federal contentions raised, or where exhaustion in state court would be futile").  Under the procedural default rule, "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice."[9]  Harris, 489 U.S. at 262.

However, for the procedural default rule to be triggered, such adequate and independent finding of procedural default should actually be made by the state court, and a mere state court's dismissal of a claim, e.g., as substantively invalid, can neither be equated to nor operate as a

---

[9]  The "cause" standard requires a petitioner to show that some external objective factor impeded his or her efforts to comply with the state procedural bar, see Murray v. Carrier, 477 U.S. 478, 485-86 (1986), while the reference to fundamental miscarriage of justice generally requires a petitioner to establish "actual innocence" by proving that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.

substitute for a finding of procedural default.  See id. (where the Supreme Court instructed that
"a federal claimant's procedural default precludes federal habeas review, like direct review, only
if the last state court rendering a judgment in the case rests its judgment on the procedural
default"); Teague v. Lane, 489 U.S. 288 (1989) (clarifying that the Harris rule is inapplicable
only where the state court was not presented with the claim being reviewed in federal court);
Lopez v. Scully, 716 F. Supp. 736, 1989 U.S. Dist. LEXIS 8457, at *8-9 (E.D.N.Y. 1989) (where
the "last state court" to consider petitioner's claim was the state trial court, which denied
petitioner relief without opinion, such state court did not "clearly and expressly" state that its
judgment rested on the state procedural bar) (relying on Harris and quoting, in turn, Caldwell v.
Mississippi, 472 U.S. 320, 327 (1985), and Michigan v. Long, 463 U.S. 1032, 1041 (1983)); see
also Cotto v. Herbert, 331 F.3d 217, 240 (2d Cir. 2003) (whether or not a procedural rule is
adequate to prevent a federal court from reaching the merits of a claim "is determined with
reference to the 'particular application' of the rule; it is not enough that the rule generally serves
a legitimate state interest"; "[t]he requirement of adequacy is intended to prevent state courts
from avoiding 'deciding federal issues by invoking procedural rules that they do not apply
evenhandedly to all similar claims'") (quoting Lee v. Kemna, 534 U.S. 362, 387 (2002), and
Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999)).

Here, Petitioner presented his ineffective assistance of counsel claims (based on
Petitioner's conjecture as to Khan's potential testimony) to the state courts.  In response, the trial
judge presiding over Petitioner's post-conviction relief proceedings and the Appellate Division
dismissed Petitioner's challenges for failure to meet the substantive test posed by Strickland v.
Washington, 466 U.S. 668 (1984), and its progeny, pointing out that Petitioner's self-serving

31

conjecture cannot meet either prong of the test.  Therefore, Petitioner's claims were dismissed on merits, rather than as procedurally defaulted, and will be reviewed by this Court accordingly.

A claim that counsel's assistance was so defective as to require reversal of a conviction has two components, both of which must be satisfied.  Id. at 687.  First, the petitioner must "show that counsel's representation fell below an objective standard of reasonableness," id. at 687-88;  "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  Id. at 690.  And – even if the first prong of Strickland is met – the defendant must show that "there is a reasonable probability that, absent the errors, the fact[-]finder would have had a reasonable doubt respecting guilt."  Id. at 695.

Moreover, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  Id. at 689 (citations omitted); see also Virgin Islands v. Weatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S. 1020 (1996).  As was explained in State v. Fritz, "[w]e can dispose of defendant's claim based on absent witnesses fairly easily. . . . The case law makes clear that such purely speculative deficiencies in representation are insufficient to justify reversal."  105 N.J. 42, 64 (1987) (collecting cases).   Finally, witness selection is entrusted to counsel's sound judgment, see Weatherwax, 77 F.3d at 1434, and attorneys are not required to call every witness suggested to them; their expertise leads them to choose only the witnesses likely to assist the case.  See Parker v. Hendricks, 2010 U.S. Dist. LEXIS 63526, at *33 (D.N.J. June 24, 2010).  "Indeed, this is precisely the type of strategic decision which the Court in

32

Strickland held to be protected from second-guessing." United States v. Ciancaglini, 945 F.

Supp. 813, 823 (E.D. Pa. 1996).

Here, Petitioner's entire ineffective-assistance claim is based on his conjecture that Khan

might have testified as to the car lot's practice to lock the night guard inside the fenced area and,

perhaps, might have even testified to having Petitioner employed as such night guard.[10]

However, Petitioner neither asserts that Khan could have testified to Khan's personal knowledge

as to actual locking of Petitioner inside the fenced area shortly before (or right at the time of) the

assault on Salierno, nor Petitioner claims that Khan could have testified to Khan's personal

knowledge as to actually finding Petitioner locked inside the fenced area shortly after (or right at

the time of) the assault on Salierno.  Furthermore, as Respondents seemingly aim to assert,

Petitioner does not contend that Khan could have even testified that the car-lot fence was such an

obstacle that it would be an impossible – or a virtually impossible – task for Petitioner to leave

the car lot for a period of time needed to partake in Salierno's murder, i.e., no statement made in

the Petition suggests that Khan could have testified that Petitioner could not simply climb out

(and then climb into) the fenced area, especially if such climbing-out-and-in had been aided by

Farmer (or by Farmer and Gloster jointly).

In sum, Petitioner's allegations make it clear that all Khan could possibly testify to was

solely Khan's preference as to general practices for running his car lot.  Conversely, no statement

---

[10]  Respondents assert that the key shortcoming of Petitioner's Ground Five is the lack of Petitioner's presentment (to the state courts and to this Court) of an affidavit from Khan as to Khan's potential testimony.  While Respondents' position to that effect is correct, and this Court adopts Respondents' conclusion, the analysis invited by Respondents need not be reached simply because even – if Petitioner submitted Khan's affidavit stating what Petitioner alleges Khan could have testified to – presence of such affidavit would not salvage Petitioner's Ground Five.

made in the Petition suggests that Khan could have testified as to any events showing Petitioner's lack of involvement in Salierno's murder.  In light of the foregoing, if was a reasonable exercise of strategic discretion for Petitioner's counsel not to seek testimony of a witness unable to aid Petitioner's defense theory

Since Petitioner's allegations do not meet even the first <u>Strickland</u> prong, <u>i.e.</u>, Petitioner's challenges do not show that his counsel's representation fell below an objective standard of reasonableness, this Court need not reach the second <u>Strickland</u> prong, and will dismiss Petitioner's Ground Five because the state court's dismissal of this line of Petitioner's challenges was not an unreasonable application of Supreme Court precedent.

## V.  CERTIFICATE OF APPEALABILITY

The Court denies Petitioner a certificate of appealability because Petitioner has not made "a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  <u>See</u> <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003).

## VI.  CONCLUSION

Based on the foregoing, the Court dismisses the Petition with prejudice and declines to issue a certificate of appealability under 28 U.S.C. § 2253(c).


**<u>s/Susan D. Wigenton, U.S.D.J.</u>**

Dated: January 3, 2011

34